DEPARTMENT OF SERVICES FOR CHILDREN, YOUTH, AND THEIR FAMILIES ("DSCYF"), Petitioner,

v.

Adriana GARCIAS * and, Felipe Garcias–Morale, Respondents.

File Nos. CN05–03939, 12–12–03TN. Petition Nos. 11–19138, 12–39761.

Family Court of Delaware, New Castle County.

Submitted: Sept. 13, 2013. Decided: Dec. 3, 2013.

---

* The Court has assigned pseudonyms to the parties, children, relatives, and lay witnesses in this case in order to protect their identities.

Para Wolcott, Esquire, Department of Justice, Wilmington, Delaware for Petitioner, Department of Services for Children Youth and Their Families.

Julie Yeager, Esquire, The Yeager Law Firm, LLC Wilmington, Delaware for Respondent, Adriana Garcias.

David J.J. Facciolo, Esquire, Minster & Facciolo, LLC Wilmington, Delaware for Respondent, Felipe Garcias–Morale.

Christine Kane, Esquire, White and Williams, LLP Wilmington, Delaware, Guardian ad Litem for Sonia Garcias–Morale and Esmeralda Garcias–Morale.

COONIN, Judge:

## NATURE OF THE PROCEEDINGS

This is the decision on the Petition for Termination and Transfer of Parental Rights filed by Department of Services for Children, Youth and Their Families, Division of Family Services (hereinafter "DFS") against Adriana Garcias (a.k.a. Adriana Barrista) (hereinafter "Mother") and Felipe Garcia–Morale (hereinafter "Father") regarding Sonia Garcias–Morale (d.o.b. XX/XX/2005) (hereinafter "Sonia") and Esmeralda Garcias–Morale (d.o.b. XX/XX/2007) (hereinafter "Esmeralda") (hereinafter collectively referred to as "the children").

DFS seeks to terminate the parental rights of Mother in the children in accordance with 13 *Del. C.* § 1103(a)(5) on the grounds of "failure to plan" as she has been unable or has failed to plan adequately for the children's physical needs or mental health and development. DFS seeks to terminate Father's parental rights in the children in accordance with 13 *Del. C.* § 1103(a)(2) on the grounds that Father abandoned the children. Additionally, DFS seeks to terminate the parental rights of Father in the children in accordance with 13 *Del. C.* § 1103(a)(5) on the grounds of "failure to plan" as he has been unable or has failed to plan adequately for the children's physical needs or mental health and development.

A hearing on the Petition for Termination and Transfer of Parental Rights was held on September 13, 2013. Mother appeared at the hearing and was represented by Julie Yeager, Esquire. Father was not present for the hearing as he was deported to Mexico in September 2011. The Court attempted to contact Father three times using a telephone number provided by Father's attorney, David Facciolo, Esquire. Father did not answer the telephone and a voicemail was left informing him of the hearing. The Court proceeded to take evidence without Father participating. Mr. Facciolo's motion to withdraw as Father's attorney was granted. Christine Kane, Esquire served as the children's Guardian *ad Litem.*

## PROCEDURAL HISTORY

The children entered the care and custody of DFS pursuant to an Emergency *Ex Parte* Order for Custody issued on June 23, 2011. In the Dependency/Neglect Petition, DFS alleged that Mother had an open treatment case since April 2011, the home that Mother and the children were residing in was in foreclosure, and Mother faced eminent eviction. DFS also had concerns about Mother's mental health, recurring incidents of domestic violence in the household, and emotional abuse committed by Mother and Father. Additionally, DFS alleged that Mother's brother, a Tier 2 Sex Offender, was residing in her home and had access to the children. On June 27, 2011, the Court appointed Christine Kane, Esquire as Guardian *ad Litem* for the children.

Following a Preliminary Protective Hearing held on June 29, 2011, the Court issued an Order on June 30, 2011. The Court determined there was probable cause that the children were dependent as defined by 10 *Del. C.* § 901(8). Mother stipulated to a finding of probable cause of

dependency on account of her home being in foreclosure, her continuing mental health issues, and her failure to bring Sonia to therapy appointments. Father was not present for the Preliminary Protective Hearing, because he was incarcerated in York, Pennsylvania. The children were placed together in a DFS foster home. Kelly Sasso, Esquire was appointed to represent Mother.

Following an Adjudicatory Hearing held on August 1, 2011, an Order was issued on August 3, 2011 finding that the children were dependent. Mother stipulated to a finding of dependency based upon her lack of stable housing. Father did not appear for the Adjudicatory Hearing as he remained incarcerated in York, Pennsylvania and was awaiting deportation to Mexico. A maternal relative from New Jersey indicated to DFS that she was interested in filing for guardianship of the children. During a forensic interview, Sonia disclosed that she was sexually abused and it was reported that she frequently soiled herself as a result of this abuse. DFS also expressed concerns about Esmeralda dancing in a sexually suggestive manner around Maternal Grandfather during visitation. Following this hearing, Maternal Grandfather was prohibited from having contact with the children because of concerns regarding his substance abuse. Mother was charged with two counts of Endangering the Welfare of a Child for permitting her brother, a Tier 2 Sex Offender, to reside in the same home as the children.

A Dispositional Hearing was held on September 14, 2011 and an Order was subsequently issued on September 29, 2011. At this hearing, the Court determined the children remained dependent and DFS has made reasonable efforts to reunify the family. DFS created a Case Plan for Mother on May 26, 2011 and later revised on August 23, 2011. Mother executed the Case Plan on September 14, 2011 after reviewing it with her attorney and the Court approved the Case Plan. DFS was unable to develop a Case Plan for Father, because he remained incarcerated in York, Pennsylvania awaiting deportation to Mexico. The primary elements of Mother's Case Plan included: obtaining safe and stable housing; maintaining sufficient financial resources to support the children; choosing appropriate caregivers and developing a safety plan; keeping the children current on all medical appointments; setting appropriate expectations for the children and completing a parenting course; stabilizing Mother's mental health, following the recommendations of her therapist, and taking medications as prescribed; ensuring the children regularly attend school; and complying with the terms of Mother's probation and avoiding any future legal issues. DFS reported that Mother enjoyed visitation with the children twice per week and these visits were going well. Mother's relative also had visitation with the children once per week. On October 13, 2011, David Facciolo, Esquire was appointed to represent Father.

The first Review Hearing was held on December 6, 2011. A Review Hearing Order was issued on December 8, 2011 wherein it was determined that the children remained dependent and it was in their best interest to remain in DFS custody. Father was deported to Mexico and the Court unsuccessfully attempted to contact him by telephone. DFS reported that Mother was making moderate progress on her Case Plan. Mother submitted paperwork which delayed a Sheriff's Sale of her home. However, there were still concerns about the condition of Mother's home, including a pest infestation. Mother was in the process of submitting employment applications. Mother was enrolled in the "Triple P" parenting course. Mother reg-

ularly attended therapy sessions through Harmonious Minds, but she did not always take medications as prescribed. Mother continued to regularly attend visitation with the children. DFS reported that Sonia disclosed being sexually abused by a non-relative named "Cholo" while she was in Mother's care. Mother's relative indicated that she was no longer interested in petitioning for guardianship of the children.

A second Review Hearing was held on February 28, 2012. A Review Hearing Order was issued on February 29, 2012, wherein it was determined that the children remained dependent and it was in their best interest to remain in DFS custody. Father did not attend this hearing, because he had been deported to Mexico. Father's attorney was not able to reach him by telephone to participate in the hearing. Mother's home continued to be in foreclosure and a Sherriff's Sale remained imminent. Mother completed a parenting course through New Behavioral Network. Mother's Parent Aide reported that Mother was cooperative, attended the children's medical appointments, and was participating in family counseling. Mother also continued to participate in counseling at Harmonious Minds with Matthew Roloff. DFS reported that visitations between Mother and the children were going well. Mother's Relative's guardianship petition was dismissed, because she failed to appear at this hearing. Maternal cousins, (hereinafter "Cousins"), indicated that they were interested in petitioning for guardianship of the children.

On February 28, 2012, Cousins filed a Petition for Guardianship of the Children. DFS filed a Motion for Goal Change on April 20, 2012, to change the goal from Reunification to Concurrent Planning: Reunification and Guardianship. The children began residing in the Cousins' home on June 8, 2012. On June 21, 2012 DFS filed a Petition for Permanent Guardianship with Cousins.

A third Review Hearing was held on August 13, 2012. An Order was subsequently issued on August 14, 2012. Father, who remained in Mexico, participated in this hearing by telephone. The Court determined that the children remained dependent and it was in their best interest to remain in the custody of DFS. The Court granted DFS's Motion for Goal Change to Concurrent Planning: Reunification and Guardianship. Both Mother and Father indicated they would consent to the Cousins' guardianship of the children. The Guardian *ad Litem* also supported the Cousins' Petition for Guardianship. Both children began residing with Cousins on June 8, 2012 and were reported to be doing very well in their home. Mother continued to enjoy visitation with the girls for three to four hours on Saturdays. The Court scheduled a hearing to consider the Petition for Permanent Guardianship.

On October 10, 2012, DFS filed a Motion for Goal Change to change the goal from Concurrent Planning: Reunification and Guardianship to Termination of Parental Rights and Adoption. DFS filed this Motion for Goal Change after the Cousins decided to withdraw their Guardianship Petition. In support of the Motion for Goal Change, DFS averred that Mother had not completed all of the elements of her Case Plan and Father had been deported to Mexico and was unable to care for the children.

A Permanency Hearing was held on October 22, 2012 and an Order was subsequently issued on November 5, 2012. Both Mother and Father failed to appear or participate by telephone in the Permanency Hearing. The Court determined that the children remained dependent and it was in their best interest to remain in the custody of DFS. The Cousins request-

ed that their Petition for Guardianship of the children be dismissed. Cousins stated that they decided to withdraw their Petition for Guardianship because of Sonia's aggressive behavior and threatening telephone calls they received from Mother. Based on this information, the Court dismissed the Cousins' Petition for Guardianship. Father was reported to be incarcerated in Arizona after illegally reentering the United States. Mother continued to face imminent eviction as a result of foreclosure. The foreclosure proceeding was temporarily stayed as a result of Maternal Grandfather filing for bankruptcy. DFS reported that Mother's home was still not appropriate, because of an ongoing insect infestation. Mother continued to attend counseling, but was not consistently taking her medication as prescribed. As a result of not taking medication, Mother frequently suffered from anxiety attacks. DFS indicated that it was not appropriate to place the children in Mother's home because of her consistent poor decision making and lack of progress on her Case Plan. The Court granted DFS's Motion for Goal Change and approved the goal of Termination of Parental Rights for the Purposes of Adoption, however, DFS was instructed to continue concurrent planning for Reunification with Mother.

On December 9, 2012, DFS filed a Petition for the Termination and Transfer of Parental Rights against both Mother and Father. The grounds for termination of Mother's parental rights in the children was failure to plan for the children's physical needs or mental health and development pursuant to 13 *Del. C.* § 1103(a)(5). Specifically, DFS averred that the children had remained in DFS care for a period of more than 1 year; Mother had a history of abuse and neglect of the children; Mother was unable to discharge parental responsibilities as result of repeated incarceration; Mother was not willing or able to assume physical and legal custody of the children

or pay child support; and that failure to terminate Mother's parental rights will result in continued instability for the children. The grounds for termination of Father's parental rights in the children was abandonment pursuant to 13 *Del. C.* § 1103(a)(2), because Father had been deported to Mexico and was unable to discharge his parental responsibilities. Additionally, DFS sought to terminate Father's parental rights in the children on the grounds of failure to plan for the children's physical needs or mental health and development pursuant to 13 *Del. C.* § 1103(a)(5). Specifically, DFS averred that the children had remained in DFS care for a period of more than 1 year; Father had a history of abuse and neglect of the children; Father was unable to discharge parental responsibilities as result of repeated incarceration; Father was not willing or able to assume physical and legal custody of the children or pay child support; and that failure to terminate Father's parental rights will result in continued instability for the children. DFS alleged that no blood relatives were able or willing to provide care for the children. A hearing on DFS's Petition for Termination of Parental Rights was initially scheduled for March 1, 2013. Mother was personally served with Notice and Summons of the Termination of Parental Rights Petition on January 5, 2013. Service of Father was perfected by publication pursuant to 13 *Del. C.* § 1107A(f). Notice to Father of the Termination of Parental Rights Hearing was published in the January 25, 2013, February 1, 2013, and February 8, 2013 editions of *The News Journal,* a daily newspaper of general circulation in New Castle County, Delaware. Additionally, Notice to Father of the Termination of Parental Rights Hearing was published in Spanish in the January 25, 2013, February 1, 2013, and February 8, 2013 editions of *La Reforma,* a daily newspaper of general

circulation in Mexico City, Mexico, nearby where Father was believed to be residing.

A status teleconference was held on January 4, 2013 and a Pre–Trial Order was subsequently issued on January 15, 2013. At this conference, Father's attorney indicated that Father was willing to consent to the termination of his parental rights. Father's attorney was ordered to provide the Court with Father's most recent telephone number one week prior to the hearing so that arrangements could be made for an international phone call to put Father's consent to termination of parental rights on the record.

On January 31, 2013, DFS filed a Motion for an Order Authorizing the Release of Records. Specifically, DFS sought the release of records regarding the mental health, drug, and alcohol treatment of Mother at Harmonious Minds and by Dr. Melinda Tresolini at the Saint Francis Center of Hope. On February 4, 2013, the Court granted DFS's Motion for an Order Authorizing Release of Records finding that good cause existed for the release of records requested by DFS.

On February 8, 2013, Mother's attorney, Kelly Sasso, Esquire filed a Motion to Withdraw. Ms. Sasso requested to withdraw because of a conflict of interest. Specifically, Ms. Sasso reported that she is personal friends with Dr. Melinda Tresolini, a witness that DFS intended to call at the Termination of Parental Rights hearing. On February 27, 2013, the Court granted Ms. Sasso's Motion to Withdraw and rescheduled the Termination of Parental Rights hearing to September 13, 2013. On February 27, 2013, Julie Yeager, Esquire was appointed as counsel for Mother.

On May 1, 2013, the parties entered into a stipulation, wherein it was agreed that the Court would conduct a pre-hearing *in camera* review of the records of Cassandra Chapel regarding the mental health treatment of Esmeralda. On September 6, 2013, the Court ordered that Ms. Chapel's records were to be admitted into evidence at the Termination of Parental Right hearing, but Ms. Chapel would not be required to testify.

## FINDINGS OF FACT

The Court will not restate all of the testimony and evidence presented at the hearing but will note some of the relevant evidence in support of its findings.

Mother is reported to have four children: an older daughter born on August 18, 1992, an older son born February 13, 1997, Sonia, and Esmeralda. Sonia and Esmeralda came into DFS care on June 22, 2011 as result of concerns about Mother's home being in foreclosure, Mother's continuing mental health issues, and Mother's brother, a Tier 2 Sex Offender, living in her home. Sonia and Esmeralda have resided together in the same DFS foster home while they have been in care.

Mother has an extensive history of involvement with DFS. Since August 2000, there have been 17 DFS investigations into Mother's home and Mother has had 3 open treatment cases with DFS. All of the investigations and treatment cases involved domestic violence, physical abuse, sexual abuse, or some combination of these issues. Mother contacted DFS in August 2000, because she was hitting her older son and needed help stopping. Between June 2001 and January 2002 there were several referrals to DFS regarding Mother and Father's abuse of both older children. On December 28, 2004, DFS was contacted, because Father was allegedly striking Mother while she was pregnant with Sonia.

Sonia was first placed in foster care on July 20, 2005, pursuant to an Emergency *Ex Parte* Custody Order. DFS reported that Sonia was exposed to domestic violence, where Father was the perpetrator and Mother was the victim and would not

protect herself. Additionally, there were concerns regarding Father's heavy alcohol use and Mother's mental health. On October 11, 2005, Sonia was adjudicated to be a dependent child and remained in DFS care for several months. Mother and Father both made adequate progress on their case plans and custody of Sonia was rescinded to her parents on April 17, 2006. There was an additional treatment case open between February 2009 and October 2009 regarding Mother and Father's care of Sonia and Esmeralda. However, Sonia and Esmeralda remained in parents' care at this time.

Both Mother and Father have been substantiated by DFS several times for abuse and neglect of their children. In July 2002, Mother was substantiated for severe emotional neglect of her two older children. In July 2005, Mother and Father were both substantiated for severe emotional neglect of Sonia. In September 2010, Father was substantiated for severe emotional abuse of Sonia and Esmeralda. In June 2011, Mother was substantiated for emotional neglect of Sonia and Esmeralda.

Mother and Father have a history of repeatedly exposing their children to dangerous individuals and failing to protect them these individuals. On October 25, 2002, Mother's brother was convicted of Rape 2nd Degree. The victim was Mother's older daughter, who was ten-years old at the time of the crime. As part of his sentence, Mother's brother was ordered to have no contact with the victim's family, to register as a sex offender, and have no contact with children under the age of 16.

In September 2010, Mother reported to police that she was concerned that Cholo, a non-relative who was living in her home, was sexually abusing Sonia. Mother admitted that she had suspected that Cholo was "kissing on Sonia" and abusing her since July 2010. Mother neglected to contact the police or remove Cholo from her home for an extended period of time. Sonia underwent a forensic interview when she came into care and she made disclosures that were consistent with her being sexually abused by Cholo.

In September 2010, the children were exposed to a severe domestic violence incident. Father choked Mother and chased Mother with a knife in front of the children. As a result of this incident, Father was arrested and charged with Endangering the Welfare of a Child, Strangulation, Assault, Terroristic Threatening and Offensive Touching. On April 26, 2011, Mother filed a Petition for a Protection from Abuse Order ("PFA") against Father. Mother alleged that Father threatened to kill her, had choked her, and chased her with a knife in front of the children. On May 5, 2011, Father entered into a consent PFA and agreed to have no contact with Mother and the children. However, on May 18, 2011, Mother filed a Motion to Vacate the PFA and the Order was subsequently vacated on June 13, 2011.

In May 2011, Mother's brother, now a Tier 2 Sex Offender, was released from prison after serving nine years for a conviction of Rape 2nd Degree, where the victim was Mother's older daughter. After his release from prison, Mother permitted her brother to eat and bathe in her home. Mother argued that her brother did not sleep in her home. However, Mother admitted that she knew her brother was a sex offender and that it was dangerous to allow him into her home where he could have access to Sonia and Esmeralda.

Between June 2012 and July 2012, Mother's brother-in-law, Manuel, resided in her home. Mother admitted that Manuel repeatedly hit and beat her. DFS discovered a bite mark on Mother's hand which apparently was from an altercation

between Mother and Manuel. In August 2012, Manuel severely injured Maternal Grandfather. Manuel was eventually deported to Mexico.

Mother continues to reside with Maternal Grandfather. Maternal Grandfather owns the home that Mother lives in. Mother serves as a caretaker for Maternal Grandfather, who is disabled. Maternal Grandfather underwent a tracheotomy as a result of throat cancer and now uses an external voice box to communicate. Despite having cancer, Maternal Grandfather continues to smoke, using tobacco gathered from disposed cigarette butts as fill for a pipe. Maternal Grandfather is also an alcoholic who still occasionally drinks. Mother relies on Maternal Grandfather for transportation, since she does not have a driver's license, and DFS believes that Maternal Grandfather occasionally drives while intoxicated. Per an Order of the Court, Maternal Grandfather is not been permitted to attend visitation with Sonia and Esmeralda, due to concerns over his drinking.

DFS also expressed concerns regarding Mother's parenting skills and her ability to set appropriate expectations for the children. Between January 2005 and July 2005, Mother was in treatment through DFS for domestic violence counseling. In January 2011, after conducting an examination of Sonia and Esmeralda, A.I. DuPont Hospital reported that the children have inappropriate knowledge of sex for their age. Mother admitted that she occasionally disciplines the children by "bopping" them with a shoe. In April 2011, Mother called DFS and reported that she "could no longer care for the children on her own." When the children came into foster care in June 2011, Mother could not think of any relatives that could serve as an appropriate placement resource for the children.

Mother completed the New Behavioral Network's "Triple P" Parenting Course on October 27, 2011. Mother also met one-on-one weekly with a Parent Aide from New Behavioral Network. New Behavioral Network reported that Mother's strengths included maintaining employment, being dedicated to reunification, being cooperative with staff, and showing love, affection, and a strong bond with the children. Mother has applied some of the skills she learned from parenting classes during visits with the children, but she has not been consistent. Specifically, Mother has trouble dealing with Sonia's temper tantrums during visits. Mother will often to look to the Parent Aide during visits for support and reassurance. Mother also has a hard time saying "no" to the children or calming them down when they are hysterical. The Parent Aide reported that Mother's interaction with the children is "child-like" and she has difficulty assuming the role of a parent. Mother testified that she loves her children and "will do whatever it takes to get them back in her home." However, Mother also agreed that it would be "more on her plate" if the children were to return to her home.

A final divorce decree was entered between Mother and Father on September 5, 2013. Mother reported that she has a new paramour who she sleeps with several times per week. Mother's paramour apparently wants to have children, but Mother said she was unsure about whether to do this.

Mother has struggled to secure stable, safe housing that is appropriate for the children. Mother currently resides with Maternal Grandfather in a home that he owns. In May 2011, when DFS investigated Mother's home, it was in an unsanitary condition and was infested with roaches and bedbugs. When DFS returned to Mother's home in May 2013, it continued

to have a pest infestation. Mother did not arrange for an exterminator come to her home until August 2013. Mother's home mortgage also remains in foreclosure status. No mortgage payment has been made in over two years. In May 2011, Mother received a 30 day notice of a Sheriff's Sale. Mother has not been evicted from her home, but she has not reached a final settlement with the mortgage company for a loan modification. The current monthly mortgage payment on the home is approximately $1550 and Mother hopes that this payment will be cut in half, but she has not reached an agreement with the Creditor to do this. The Parent Aide has offered to connect Mother with alternative housing arrangements, but Mother has refused to follow through on this, because she does not want to "live in a shelter." DFS admitted that Mother's home would be physically appropriate with the exception of the pest infestation and concerns regarding foreclosure. Mother admitted that she currently lacks stable housing.

DFS expressed concerns regarding Mother's financial resources. Mother is employed part time as a janitor and earns approximately $587 per month. Mother also receives $440 per month in Social Security income and $220 per month in food stamp benefits. Mother testified that she has attempted to find higher paying, full time employment, but has not been successful. Additionally, Mother's current hours are between 6 p.m. and 10 p.m. and she was unsure of who would provide child care while she was at work. Mother also has several hundred dollars of unpaid debt owed to the telephone and cable companies. Mother estimated that her household expenses are approximately $1063 per month. Maternal Grandfather receives a pension payment of $372 per month and a disability benefit of $1383. However, Maternal Grandfather also pays $662 per month on a mortgage for a home located in New Castle, Delaware. Mother's brother

lives in this home and does not contribute to the mortgage payment. Mother prepared two prospective budgets with her Parent Aide. One budget assumes that Mother will continue to live with Maternal Grandfather and the other budget assumes that Mother will live on her own with the children. The budgets estimate that Mother will have a monthly surplus between $66 and $164. However, Mother argued that if the children lived with her, she would receive additional social security benefits as a result of their disabilities.

There are also significant concerns regarding Mother's mental and physical health. Mother suffers from anxiety, depression, and Post–Traumatic Stress Disorder. The symptoms of these disorders can be severe and Mother often becomes overwhelmed by them. Mother admitted to having occasional "nervous breakdowns," during which she is unable to provide care for the children. Mother was hospitalized in the Rockford Center in April 2002 and in April 2011 for suicidal ideation. Mother is prescribed the antidepressant Lexapro, but she has not regularly taken the medication, because it "makes her tired." Mother also has a heart murmur, suffers from panic attacks, and has nerve damage as a result of her brother-in-law severely beating her. At the hearing, Mother indicated that it has been several months since her last panic attack. Mother denied using any drugs, but admitted that she drinks occasionally.

Dr. Debbie Black conducted a mental health evaluation of Mother on February 10, 2012. Dr. Black's concerns about Mother included elevated levels of hostility that may pose a safety risk to the children and a lack of emotional management skills that may prevent her from effectively disciplining the children. Dr. Black also conducted tests which indicated that Mother has borderline intellectual functioning. It

was recommended that Mother receive significant support for the care of her children and attend psychotherapy sessions on a weekly basis.

Mother's treating physician, Dr. Melinda Tresolini, testified regarding Mother's mental and physical health. Dr. Tresolini has seen Mother as a patient for the past thirteen years, prescribed antidepressants for Mother, and seen Sonia and Esmeralda for their check-ups. Dr. Tresolini last saw Mother in August 2012. Dr. Tresolini stated that she has concerns about Mother's ability to protect herself and her children from dangerous individuals and situations. For example, Father kicked Mother repeatedly while she was pregnant with Sonia. Dr. Tresolini was unsure if Mother has the intellectual ability to make appropriate decisions for the children. Specifically, Mother does not always follow medical advice for herself and the children. Dr. Tresolini was also concerned about Mother's capacity to make appropriate judgments. It does not always occur to Mother that she can say "no" to someone, because she has a strong desire to help others. Dr. Tresolini admitted that Mother has seemed less depressed lately.

Matthew Roloff, Mother's therapist at Harmonious Minds, testified regarding Mother's mental health and progress with therapy. Mr. Roloff has seen Mother for approximately three years since October 2010. He worked with Mother on depression, stress management and anxiety. Mr. Roloff reported that Mother has been compliant with attendance at sessions and improved throughout treatment. Mr. Roloff discussed with Mother ways of better protecting herself and the children from physical and sexual abuse. He believes that Mother is taking more time to consider her decisions and their consequences than she had previously. Mr. Roloff recommended that the children be returned to Mother with supervision and support services in place. Specifically, he recommended that Mother receive overnight visitation, a caretaker to supervise the children while she is at work, parent aide services, and that Mother continue therapy for an additional six to twelve months. Mr. Roloff testified that even without these services in place, he believed that Mother had the ability to care for the children. Mr. Roloff admitted that he was not aware of Sonia and Esmeralda's special needs, that he never interviewed the children, and that he only casually observed the children twice in 2010, when they sat next to Mother during two of her therapy sessions. The Court will greatly discount Mr. Roloff's testimony in light of his lack of knowledge regarding the children's needs.

DFS has not had regular contact with Father throughout this case as a result of his incarceration and deportation to Mexico. Accordingly, DFS has not been able to establish a Case Plan with Father. On September 24, 2010, Father attacked Mother with a knife and strangled her in front of Sonia. As a result of this incident, Father was charged with Endangering the Welfare of a Child, Strangulation, Assault 3rd Degree, Terroristic Threatening, and Offensive Touching, and was incarcerated in York, Pennsylvania by Immigration and Customs Enforcement awaiting deportation to Mexico. Father was deported to Mexico in September 2011. Father has not had contact with Sonia and Esmeralda since he was deported to Mexico. In October 2012, Father was detained in Arizona after illegally reentering the United States. In April 2013, Father threatened that he would try to bring the children to Mexico with him and kill any DFS worker that got in the way. As a result of this, on May 31, 2013, DFS obtained a Protection from Abuse Order against Father on behalf of the children.

Both Sonia and Esmeralda are high needs children. Sonia has been diagnosed with Post–Traumatic Stress Disorder, sexual abuse, enuresis, ADHD—combined type, and encopresis. Sonia is prescribed Focalin, Abilify, and Hydroxyzine. Sonia was admitted to the Terry Center's Day Program on December 18, 2012, and is currently enrolled in the 2nd grade through the Program. Sonia receives therapy and medical services through the Terry Center. She sees Regina Combs for one hour once per week for therapy. During therapy, Sonia disclosed that she was sexually abused. Sonia has gastrointestinal issues and is unable to have a bowel movement on her own. Sonia sees a gastroenterologist specialist at A.I. DuPont Hospital for these issues. Treating physicians believe that Sonia's encopresis is the result of past sexual abuse. Esmeralda is currently in the 1st grade. Esmeralda is diagnosed with ADHD, for which she is prescribed Risperdal and Vivance. Esmeralda regularly sees Cassandra Chapel for therapy. Sonia and Esmeralda have remained placed in the home of Shannon Cliff, a DFS foster parent, throughout the entire time they were in care. DFS believes that Sonia and Esmeralda are adoptable if they are adopted together. A pre-adoptive family has not yet been identified, but 2 families have indicated that they are interested in adopting Sonia and Esmeralda.

## ANALYSIS

■ In making the determination of whether to terminate parental rights, the Court must perform a multi-step analysis.

First, the Court must be satisfied that the evidence presented meets one or more of the enumerated statutory grounds for termination provided in 13 *Del. C.* § 1103.[1] If the statutory basis for termination of parental rights is failure to plan, then the Court must review whether DFS developed a meaningful Case Plan and made reasonable efforts to reunify the family.[2] As a final step, the Court must determine that it is in the children's best interest to sever the parental rights.[3] Given the importance of the rights at stake and the permanent nature of this proceeding, DFS must prove these elements by clear and convincing evidence.[4]

The law traditionally recognizes parental rights as fundamental rights which may not be abrogated absent compelling reasons.[5] However, the Federal Adoption and Safe Families Act of 1997 (ASFA) acknowledges the countervailing importance of the child's safety and need for permanency by placing limits on the time in which parents are given to rehabilitate themselves and assume their parental responsibilities, provided the State has met its duties to provide a meaningful process and reasonable efforts to reunify the family.[6]

### A. Statutory Grounds for Termination of Parental Rights

DFS seeks termination of Mother's parental rights on the grounds of failure to plan adequately for the children's physical needs or mental and emotional health and development, pursuant to 13 *Del. C.* § 1103(a)(5). DFS seeks to terminate Fa-

1. *Shepherd v. Clemens*, 752 A.2d 533, 536–537 (Del.2000) (en banc) (Burger, J. dissenting); *In re Stevens*, 652 A.2d 18, 24 (Del.1995).

2. *D.F.S. v. N.S. and R.T.*, 2009 WL 5206720, at *18 (Del.Fam. Dec. 11, 2009).

3. *Id.*

4. *Patricia A.F. v. James R.F.*, 451 A.2d 830 (Del.1982).

5. *Id. See also, In re Stevens*, 652 A.2d 18, 24 (Del.1995).

6. *In re K.L.T.*, 2001 WL 493113 (Del.Fam. Jan. 22, 2001).

ther's parental rights based on the grounds of abandonment pursuant to 13 *Del. C.* § 1103(a)(2). Additionally, DFS seeks to terminate Father's parental rights on the grounds of failure to plan adequately for the children's physical needs or mental and emotional health and development pursuant to 13 *Del. C.* § 1103(a)(5).

### 1. Failure to Plan—Mother

██ The Court finds that DFS proved by clear and convincing evidence that Mother failed to adequately plan for the children's physical needs or mental and emotional health and development. Pursuant to 13 *Del. C.* § 1103(a)(5), in the case of a child that is in DFS care, the Agency must show that the parent failed to adequately plan for the children's physical needs or mental and emotional health and development and also show one or more of the following conditions are met in order to terminate a parent's rights on the grounds of "failure to plan": (1) The child has been in the care of the DFS for a period of 1 year, or for a period of 6 months in the case of a child who comes into care as an infant, or there is a history of previous placement or placements of this child; (2) There is a history of neglect, abuse or lack of care of the child or other children by the respondent; (3) The respondent is incapable of discharging parental responsibilities due to extended or repeated incarceration; (4) The respondent is not able or willing to assume promptly legal and physical custody of the child, and to pay for the child's support, in accordance with the respondent's financial means; or (5) Failure to terminate the relationship of parent and child will result in continued emotional instability or physical risk to the child.

DFS created a Case Plan for Mother on May 26, 2011 and later revised the Plan on August 19, 2011. Mother executed the Case Plan on September 14, 2011 after reviewing it with her attorney. The Court approved Mother's Case Plan in an Order dated September 21, 2011 following a Dispositional Hearing. The Case Plan identified eight "problem areas" for Mother to make progress on in order to work towards reunification with the children. Specifically, Mother's Case Plan required that she: secure safe and stable housing for herself and the children; plan a budget that adequately provides for her the needs of the children; choose appropriate substitute caregivers for the children; ensure that the children attend medical and dental appointments; set appropriate expectations for the children and complete a parenting course; stabilize her mental health; ensure that the children attend school; and comply with the terms of her probation and avoid any future legal issues. Mother failed to make adequate progress on five of the eight "problem areas" identified in her Case Plan.

Mother has not secured stable housing that is appropriate for the children. Mother continues to reside in a home owned by Maternal Grandfather which remains in foreclosure. No payment has been made on the mortgage for over two years. The mortgage lender has not approved a modification of the loan and a Sheriff's Sale and eviction remains imminent. Despite efforts made by her Parent Aide, Mother refused to explore alternative housing options, because she "does not want to live in a shelter." Until recently, Mother's home was infested with roaches and bed bugs. Mother did not hire an exterminator to treat the home until August 2013. DFS does not believe that Mother's current home is appropriate for the children. Mother failed to make adequate progress on this element of her case plan.

Mother has not demonstrated that she has stable finances to provide for the needs of the children. When the children

came into care Mother's sole source of income was Social Security Disability payments. Mother has since secured part-time employment as a janitor and makes approximately $550 per month. She also continues to receive some Social Security benefits as well as food stamps. Mother indicated that she is seeking a higher paying full time job, but she has been unable to secure other employment. Mother prepared a prospective budget with her Parent Aide. Even with relatively modest expenses, if the children were to come back into her care, Mother will only have a surplus between $66 and $164 per month. Mother has not demonstrated that she has sufficient financial resources to support the children and accordingly, she has not made adequate progress on this element of her Case Plan.

Mother has not identified appropriate alternative childcare providers for the children. Mother failed to name relatives or other individuals that could serve as appropriate guardians for the children. The Cousins withdrew their Petition for Guardianship partially because of harassing telephone calls they received from Mother. Additionally, Mother's current job requires that she works between 5 p.m. and 10 p.m. Mother indicated that she does not have a plan in place for childcare during the period of the day that she has to be at work. Maternal Grandfather is not an appropriate childcare provider due to concerns over his alcoholism. In the past, DFS has observed Maternal Grandfather drinking or acting in a manner that indicated he was intoxicated. Accordingly, Mother has failed to make adequate progress on this element of her case plan.

Mother's Case Plan requires that she attend all of the children's medical and dental appointments. Previously, there was a concern that Sonia missed several therapy sessions while she was in Mother's care. While in DFS care, the children have remained current on all of their medical and dental needs. When invited, Mother has attended the children's medical appointments. However, due to concerns that Mother's presence may hinder the progress that the children are making in therapy, Mother has not been invited to all of the children's therapy and mental health appointments. Based on Mother's willingness to be engaged in the children's medical needs, Mother has made adequate progress on this element of her Case Plan.

Mother's Case Plan requires that she complete a parenting course and set appropriate expectations for the children. Mother completed the "Triple P" Parenting Course through New Behavioral Network on October 27, 2011. Mother also worked with a Parent Aide from New Behavioral Network to develop appropriate expectations for the children. While Mother completed a Parenting Course, she had difficulty applying the parenting skills that were taught. Specifically, the Parent Aide coordinator expressed concerns over Mother's ability to address Sonia's temper tantrums. During visits with the children, the Parent Aide indicated that Mother often became overwhelmed, did not know how to appropriately discipline the children, and would often look for support and reassurance. Mother is also reported to have a difficult time assuming the role of a parent and she often behaves in a "child-like" manner during visitation. Mother has not made adequate progress on the setting appropriate expectations for her children element of her Case Plan.

Mother's Case Plan required that she stabilize her mental health so that it will not impact the care of the children. Mother suffers from anxiety, depression, and Post–Traumatic Stress Disorder. The symptoms of these disorders often cause Mother to become overwhelmed and suffer "nervous breakdowns," leaving her unable

to adequately care for the children. Mother regularly attends therapy sessions at Harmonious Minds, where she has been working with Matthew Roloff on her depression, anxiety, and stress. However, Mother has not been consistent in taking here prescribed medication. Mother is prescribed Lexapro for anxiety and depression and, until recently, Mother did not take this medication, because it "made her tired." This resulted in Mother's mental health remaining unstable and she continued to suffer panic attacks. Since Mother has not stabilized her mental health, she has not made adequate progress on this element of her Case Plan.

Mother's Case Plan required that she resolve all truancy regarding Sonia and notify Sonia's school if she will be absent. Before entering DFS care, there were concerns that Sonia was truant from school. Sonia has been consistently attending school through the Terry Center and all truancy issues have been resolved. Accordingly, Mother has made adequate progress on this element of her case plan.

Mother's Case Plan required that she comply with all of the terms of her probation. On April 27, 2011, Mother pled guilty to Offensive Touching and was subsequently placed on probation. On August 9, 2011, Mother pled guilty to Endangering the Welfare of a Child and was found to be in violation of her probation. Mother was sentenced to probation at Level III supervision for a period of 1 year. Mother complied with the terms of her probation and was not subsequently found in violation. Therefore, Mother made adequate progress on this element of her Case Plan.

Overall, however, Mother has failed to meet .all the Case Plan's required elements. Based on Mother's lack of progress on her Case Plan, the Court finds the evidence is clear and convincing that Mother has failed to adequately plan for the children's physical needs or mental and emotional health and development. Mother's continuing failure to plan for the children has resulted in them remaining in foster care for an extended period of time. Failure to terminate Mother's parental rights will result in will result in continued emotional instability or physical risk to the children, as Mother has been unable to provide consistent care and support.

■ In addition, the Court finds there is clear and convincing evidence of at least one of the additional criteria for termination of parental rights enumerated in 13 *Del. C.* § 1103(a)(5)(a). The children entered DFS care on June 22, 2011. As of the date of the Termination of Parental Rights Hearing, the children had been in care for approximately two years and three months. Thus, the Court finds that, pursuant to 13 *Del. C.* § 1103(a)(5)(a)(1), the children have been in the care of the DFS for a period of greater than the statutorily required one year.

### 2. Abandonment—Father

■ DFS seeks to terminate Father's parental rights on the grounds that he abandoned the children. Pursuant to 13 *Del. C.* § 1103(a)(2)(a)(2), in the case of a child that has obtained the 6 months of age at the time a petition for the termination of parental rights is filed, the Court may order termination of parental rights if the Court finds that the respondent intended to abandon the child and for a period of at least 6 consecutive months in the year preceding the filing of the petition the respondent has failed to communicate or visit regularly with the minor and failed to manifest an ability and willingness to assume legal and physical custody of the minor, if, during this time, the minor was not in the physical custody of the other parent. In order to determine that intentional abandonment occurred, the Court must find that Father had a "settled pur-

pose" to abandon the children and "surrender any further parental claims" to the children.[7] A "settled purpose" is shown through "a present continuing intent to abandon up to the time the termination proceedings were filed."[8]

In July 2011, shortly after the children were placed in DFS care, Father was incarcerated in York, Pennsylvania by Immigration and Customs Enforcement awaiting deportation to Mexico. Father was subsequently deported to Mexico in September 2011. In October 2012, Father was detained in Arizona for attempting to illegally reenter the United States. In April 2013, Father threatened that he would try to bring the children to Mexico with him and kill any DFS worker that got in the way. As a result of this, on May 31, 2013, DFS obtained a Protection from Abuse Order against Father on behalf of the children.

Throughout the over two year period that the children have been in DFS care, there has been no regular physical contact or communication between Father and the children. Father has not made any child support payments while the children have been in care. DFS was unable to develop a Case Plan with Father, because of his incarceration and deportation to Mexico. Additionally, Father's current immigration status would make it difficult for him to assume parental responsibility for the children. Accordingly, Father's actions from as early as July 2011 demonstrate a "settled purpose" to abandon and "surrender any further parental claims" to the children. DFS filed a Petition to terminate Father's parental rights on December 9, 2012. During a period of at least 6 consecutive months in the year preceding the filing of the Petition for Termination of Parental Rights, Father failed to communi-

cate or visit regularly with the children and did not manifest an ability and willingness to assume legal and physical custody of the children. Therefore, the Court finds by clear and convincing evidence that Father's parental rights may be terminated, because he abandoned the children pursuant to 13 *Del. C.* § 1103(a)(2).

### 3. *Failure to Plan—Father*

■ Only one statutorily ground is required to be established to terminate parental rights. Therefore, having established that Father abandoned the children by clear and convincing evidence, the Court need not reach a conclusion as to the alternate ground of failure to plan. The Court notes, however, that had it been necessary to reach a conclusion with regard to Father's failure to plan, the Court finds by clear and convincing evidence that Father failed to adequately plan for the children's physical needs or mental and emotional health pursuant to 13 *Del. C.* § 1103(a)(5).

As discussed above, Father was incarcerated in York, Pennsylvania in July 2011 and subsequently deported to Mexico in September 2011. DFS was not able to consistently communicate with Father during the entire period that the children were in care. Father did not attend or participate in any hearings, other than a review hearing held on August 13, 2012, where he participated by telephone. DFS was not able to develop a Case Plan with Father. Accordingly, based on Father's incarceration and deportation to Mexico as well as DFS's inability to create a Case Plan with Father, the Court finds the evidence is clear and convincing that pursuant to 13 *Del. C.* § 1103(a)(5) Father has failed to adequately plan for the children's physical needs or mental and emotional health and development. Additionally, the

---

**7.** *Barr v. Division of Family Services,* 974 A.2d 88, 94 (Del.2009) (*internal citations omitted*).

**8.** *Id.*

Court finds there is clear and convincing evidence of at least one of the additional criteria for termination of parental rights enumerated in 13 *Del. C.* § 1103(a)(5)(a). The children entered DFS care on June 22, 2011. As of the date of the Termination of Parental Rights Hearing, the children had been in care for approximately two years and three months. Thus, the Court finds that, pursuant to 13 *Del. C.* § 1103(a)(5)(a)(1), the children have been in the care of the DFS for a period of greater than statutorily required one year.

## B. DFS Reasonable Efforts to Reunify the Family

 The Court finds that Mother's parental rights in the children can be terminated on the grounds of failure to plan and Father's parental rights in the children can be terminated on the grounds of abandonment and failure to plan. Next, the Court must consider whether DFS has made reasonable efforts to reunify Mother and Father with the children.

At the Termination of Parental Rights Hearing, Mother stipulated on the record that DFS had made reasonable efforts to reunify her with the children. Specifically, DFS developed a Case Plan with Mother, which she executed and was approved by the Court. In order assist Mother in achieving her Case Plan objectives, DFS made referrals for a parenting course, parent aide services, and a mental health eval-

uation. DFS also arranged for regular visitation between Mother and children.

DFS also made reasonable efforts to reunify Father with the children. However, these efforts were hindered by Father's incarceration and deportation to Mexico. DFS was not able to consistently communicate with Father and a Case Plan could not be developed for Father. Efforts were made to notify Father of the Termination of Parental Rights hearing by publication in newspapers in both Delaware and Mexico and by attempting to reach him by telephone on the day of hearing. These efforts were ultimately unsuccessful and Father did not participate in the Termination of Parental Rights Hearing.

Accordingly, the Court finds by clear and convincing evidence that DFS made reasonable efforts to reunify the children with Mother and Father.

## C. Best Interests of the Children

 When one or more of the statutory grounds for termination of parental rights has been established, the petition should not be granted until the Court determines by clear and convincing evidence that the termination of parental rights is in the child's best interests.[9] While required to consider all relevant factors in determining the children's best interests, the Court must specifically consider the factors enumerated in 13 *Del. C.* § 722.[10] They are as follows:

**9.** *See Division of Family Services v. Hutton,* 765 A.2d 1267 (Del.2001)

**10.** 13 *Del. C.* § 722(a) mandates that the Court consider all relevant factors including:
"(1) The wishes of the child's parents or parent as to his or her custody and residential arrangements;
(2) The wishes of the child as to his or her custodian(s) and residential arrangements;
(3) The interaction and interrelationship of the child and his or her parents, grandparents, siblings, persons cohabiting in

a relationship between a husband and wife with a parent of the child any other residents of the household or persons who significant effect the child's best interest;
(4) The child's adjustment to his or her home, school and community;
(5) The mental and physical health of all individuals involved;
(6) Past and present compliance by both parents with their rights and responsibilities to their child under § 701 of this title;

**(1) The wishes of the children's parent or parents as to his or her custody and residential arrangements;**

Mother wishes to reunify with the children. Specifically, Mother testified that she would "do whatever it takes" to have the children returned to her home.

The wishes of Father could not be ascertained, because he did not attend or participate in Termination of Parental Rights Hearing. At a January 4, 2013 Status Teleconference, Father's attorney represented that Father would be willing to consent to the termination of his parental rights. However, this could not be confirmed, since Father did not participate in the Termination of Parental Rights Hearing.

**(2) The wishes of the children as to his or her custodian(s) and residential arrangements;**

Sonia and Esmeralda are of a young age, eight years old and six years old, respectively. Accordingly, the Court did not interview the children and finds this factor inapplicable.

**(3) The interaction and interrelationship of the children with his or her parents, grandparents, siblings, person cohabiting in the relationship of husband and wife with a parent of the children, any other residents of the household or person who may significantly affect the children's best interests;**

Mother and the children have a strong bond. Mother clearly loves and cares deeply about the children. Sonia and Esmeralda lived primarily with Mother before they entered foster care in June 2011. Both Sonia and Esmeralda are reported to

generally look forward to their visits with Mother, but Sonia's therapist indicated that she sometimes gets anxious before visitation. However, there are concerns regarding Mother's ability to assume a parental role with the children. Mother had difficulty applying the skills that were taught in her parenting course. Specifically, Mother has trouble controlling Sonia's temper tantrums and appropriately disciplining the children. Mother admitted that she has "bopped" Sonia on the head with a shoe to discipline her. The Parent Aide also testified that Mother sometimes behaves in a "childlike" manner during visitation. Additionally, Mother has been substantiated multiple times for emotional abuse and neglect of the children.

A greater concern lies with the children's exposure to potentially dangerous individuals while they were in Mother's care. In 2010, an individual known as Cholo resided in Mother's household. During a forensic interview and in therapy sessions, Sonia has disclosed that Cholo sexually molested her. Mother first became aware that Cholo abused Sonia in July 2010, but Mother did not report this to the police or attempt to remove Cholo from her home until September 2010. In May 2011, Mother permitted her brother, a registered sex offender, to eat and bathe in her home. Mother's brother was convicted of Rape 2nd, where the victim was Mother's older daughter. Mother admitted that it was dangerous to allow her brother in her home, because he could potentially have access to Sonia and Esmeralda. Between June and July 2012, Mother's brother-in-law Manuel resided in her home. Manuel repeatedly physically abused Mother and Maternal Grandfa-

---

(7) Evidence of domestic violence as provided for in Chapter 7A of this title, and

(8) The criminal history of any party or any other resident of the household includ-

ing whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense."

ther. Mother's physician, Dr. Tresolini, has concerns about Mother's ability to protect herself and her children from dangerous individuals and situations. Specifically, Dr. Tresolini believes that Mother lacks the capacity to make appropriate judgments. It does not always occur to Mother that she can say "no" to someone, because she has a strong desire to help others.

Mother also resides with Maternal Grandfather and serves a caretaker for him. Maternal Grandfather is an alcoholic who continues to drink and has been observed intoxicated by DFS. Maternal grandfather is not an appropriate caregiver for the children. Maternal Grandfather's decision making is highly questionable. Specifically, Maternal Grandfather lost his larynx to cancer, yet he continues to smoke tobacco collected from discarded cigarette butts.

No evidence was introduced regarding Father's interaction with the children, because DFS did not have the opportunity to observe any visitations between the children and Father. Father was incarcerated and later deported to Mexico while the children were in DFS care. As a result of Father's immigration status, it would be difficult for the children to regularly interact with him. Additionally, Father has been substantiated for emotional abuse and neglect of the children.

Sonia and Esmeralda have remained with Shannon Cliff, a DFS foster parent, during the entire period they have been in care. The children are reported to be doing well in this foster home. Since Sonia and Esmeralda have spent over two years in DFS care, they have bonded with Ms. Cliff and they occasionally call her "Mom–Mom."

While Mother clearly loves and cares for Sonia and Esmeralda, there are serious concerns about Mother's repeated lapses in judgment regarding the individual she permits to have contact with the children. The Court, therefore, finds this factor favors granting the petition to terminate parental rights.

### (4) The child's adjustment to his or her home, school and community;

The children have resided with the Shannon Cliff, a DFS foster parent, for over two years and 3 months. All reports indicate that children are well-cared for in the home. The children have bonded with Ms. Cliff and they occasionally call her "Mom–Mom." Sonia was admitted to the Terry Center's Day Program on December 18, 2012 and is enrolled in the second grade through the Program. Sonia regularly receives therapy and support through the Terry Center for her various physical and mental health concerns. Sonia has made moderate improvements in her behavior while she has been enrolled in the Terry Center's Day Program. Esmeralda is enrolled in 1st grade and has an IEP in place. Both Sonia and Esmeralda require additional resources in school to assist them with learning and behavioral issues.

A pre-adoptive family for Sonia and Esmeralda has not yet been identified, but there are several families that have expressed interest in adopting the children. DFS indicated that Sonia and Esmeralda are adoptable if they are adopted together.

Since the children are well-adjusted to their foster family and have not resided with Mother or Father for over two years, the Court finds this factor favors granting the petition for termination of parental rights.

### (5) The mental and physical health of all individuals involved;

Mother suffers from anxiety, depression, and Post–Traumatic Stress Disorder. The symptoms of these disorders can be severe and Mother often becomes overwhelmed

by them. Mother admitted to having occasional "nervous breakdowns," during which she is unable to provide care for the children. Mother was hospitalized in the Rockford Center in April 2002 and in April 2011 for suicidal ideation. Mother is prescribed Lexapro for anxiety and depression, but she has not regularly taken the medication, because it "makes her tired." Mother also has a heart murmur, suffers from panic attacks, and has nerve damage as a result of her brother-in-law severely beating her.

Dr. Debbie Black conducted a mental health evaluation of Mother and had concerns regarding Mother's elevated levels of hostility and a lack of emotional management skills that may prevent her from effectively disciplining the children. Dr. Black also conducted tests which indicated that Mother has borderline intellectual functioning. Dr. Tresolini was also unsure if Mother has the intellectual ability to make appropriate decisions for the children. Specifically, Dr. Tresolini expressed concern that Mother does not always follow medical advice for herself and the children. Matthew Roloff, Mother's therapist at Harmonious Minds, testified that he believes that Mother is taking more time to consider her decisions and their consequences than she had previously. Mr. Roloff recommended that the children be returned to Mother with supervision and support services in place. The Court gives little to no weight to Mr. Roloff's testimony, because he has not observed Mother interacting with the children in over three years, and was only vaguely aware of the significant special needs of the children.

No testimony or evidence was introduced regarding Father's mental or physical health.

Both Sonia and Esmeralda are high needs children. Sonia has diagnoses of Post–Traumatic Stress Disorder, sexual abuse, enuresis, ADHD—combined type, and encopresis. Sonia receives regular therapy, medical services, and support through the Terry Center's Day Program. She sees Regina Combs for one hour once per week for therapy. During therapy, Sonia disclosed that she was sexually abused. Sonia has gastrointestinal issues and is unable to have a bowel movement on her own. Sonia sees a gastroenterologist specialist at A.I. DuPont Hospital for these issues. Treating physicians believe that Sonia's encopresis is the result of past sexual abuse. Esmeralda is diagnosed with ADHD and she regularly sees Cassandra Chapel for therapy.

Mother has not sufficiently stabilized her mental health concerns and her ongoing anxiety, depression, and borderline intellectual functioning prevent her from carrying out parental responsibilities. Additionally, Sonia and Esmeralda are high needs children that require extra care and attention. Accordingly, this factor favors the termination of parental rights.

**(6) Past and present compliance by both parents with their rights and responsibilities to their children under § 701 of this title;**

Pursuant to 13 *Del. C.* § 701, parents are responsible for the support, care, nurture, welfare, and education of their children. Mother clearly loves and cares for the children. However, the record reflects that Mother does not have the capacity to provide for the children's needs and has repeatedly placed the children's welfare in jeopardy. Mother has not obtained stable housing, despite this being an objective on her Case Plan for over two years. Mother's home continues to be in foreclosure and the possibility of a Sheriff's Sale and eviction remains imminent. Mother has refused to explore alternative housing options, because she "does not want to live in a shelter." Based on Mother's current

income and available financial resources, if the children were placed back in her care, it is not clear that she could provide for their basic needs. Finally, as discussed above, while the children were in her care, Mother has repeatedly exposed them to dangerous individuals and situations. Specifically, Mother permitted Cholo to remain in her home after she suspected that he was sexually abusing Sonia. Mother also allowed her brother into her home, where he could have access to the children, despite the fact that he previously convicted of the rape of her older daughter. Mother has also consistently lived with individuals that perpetrate acts of domestic violence against her. This pattern of behavior demonstrates a lack of sound judgment by Mother and an inability to comprehend when the children's welfare may be in danger.

Father has been unable to fulfill his parental rights and responsibilities, because he was incarcerated and later deported to Mexico. Father's current immigration status would make it difficult for him to discharge parental rights and responsibilities. Father has not had physical custody of communicated with the children for over two years. Additionally, Father has made no child support payments.

The Court finds that both parents have failed to comply with their rights and responsible for the support, care, nurture, welfare, and education of the children. Therefore this factor favors granting the Petition for termination of parental rights.

**(7) Evidence of domestic violence as provided for in Chapter 7A of this title;**

13 *Del. C.* § 703A defines domestic violence as "physical or sexual abuse or threats of physical or sexual abuse and any other offense against the person committed by 1 parent against the other parent, against any child living in either parent's home, or against any other adult living in the child's home."

The record reflects that there is an extended history of domestic violence in Mother's household perpetrated both by Father and other individuals. Mother and Maternal Grandfather have been the victims of this domestic violence. Father is reported to have kicked Mother in the stomach while she was pregnant with Sonia. Sonia was placed in foster care in July 2005, because Father was committing acts of domestic violence against Mother and Mother refused to protect herself. On September 24, 2010, Father attacked Mother with a knife and strangled her in front of Sonia. On April 26, 2011, Mother filed a Petition for a Protection from Abuse Order ("PFA") against Father. However, shortly after the PFA was granted, Mother filed a Motion to Vacate the Order, because she missed Father. In June 2012, Mother's brother-in-law Manuel resided with Mother and severely beat her and Maternal Grandfather. As a result of these beating, Mother suffered nerve damage.

Due to the extensive history of domestic violence in Mother's household and Father's repeated perpetration of domestic violence, this factor favors the termination of parental rights.

**(8) The criminal history of any party or any other resident of the household including whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense.**

Mother was convicted of Offensive Touching on April 27, 2011. Mother was sentenced to 6 months of probation at Level II followed by 6 months of probation at Level I, and required to complete a domestic violence program. On August 9, 2011 Mother was convicted of Endangering the Welfare of a Child. Mother was

found to be in violation of her initial probation and sentenced to an additional year of probation at Level III and complete a parenting program through New Behavioral Network.

Father's criminal record was not introduced into evidence. However, Father was charged with Endangering the Welfare of a Child, Strangulation, Assault 3rd Degree, Terroristic Threatening, and Offensive Touching following the September 2010 incident where Father chased Mother with a knife and strangled her. Father was incarcerated in July 2011 in York, Pennsylvania on criminal charges and ultimately he was deported to Mexico as a result of these charges.

Since both Mother and Father have recent criminal convictions and charges, this factor favors the termination of parental rights.

## CONCLUSION

The Court finds that DFS has established by clear and convincing evidence the statutory grounds for the termination of Mother's parental rights in the children pursuant to 13 *Del. C.* § 1103(a)(5), as Mother has failed to adequately plan for the children's physical needs or mental and emotional health and development and the children have been in the care of DFS for over two years and three months. The Court finds that DFS has established by clear and convincing evidence the statutory grounds for termination of Father's parental rights pursuant to 13 *Del. C.* § 1103(a)(2) as Father has intentional

abandoned the children. Furthermore, while it is not necessary to prove an alternative ground, the Court finds Father failed to plan adequately for the children's physical needs or mental health and development pursuant to 13 *Del. C.* § 1103(a)(5).

The Court finds by clear and convincing evidence that DFS has made reasonable efforts to reunify the children with Mother and Father.

After considering all relevant factors, The Court finds that termination of parental rights is in the best interest of the children. Other than Mother's desire to have the children returned to her care and Mother's strong bond with the children, there is little else to support the proposition that termination of parental rights is not in the children's best interest. "Best Interest" must be considered in its totality from the child's perspective, not from the parent's perspective. What may be desired by the parent is frequently at odds with what is in the best interest of the child.

Accordingly, the Court orders the termination of both Mother's and Father's parental rights in Sonia Garcias–Morale (d.o.b. XX/XX/2005) and Esmeralda Garcias–Morale (d.o.b. XX/XX/2007). Custody of Sonia and Esmeralda shall remain with DFS until adoption.